UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

MARK DUANE POPE,

             Plaintiff,

v.

CAROLYN W. COLVIN,[1] Acting
Commissioner of Social Security,

             Defendant.

Case No. C-12-05503-RMW

**ORDER DENYING THE
COMMISSIONER'S MOTION FOR
SUMMARY JUDGMENT AND
GRANTING POPE'S MOTION FOR
REMAND**

**[Re: Docket Nos. 16, 17]**

      Plaintiff Mark Pope ("Pope") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his claims for disability insurance benefits under the Social Security Act. Presently before the court are the parties' cross-motions for summary judgment and Pope's motion in the alternative to remand. Having considered the papers submitted by the parties and the entire administrative record, and for the reasons set forth below, the court DENIES the Commissioner's cross-motion for summary judgment and GRANTS Pope's motion for remand.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Carolyn W. Colvin for Michael J. Astrue as the defendant in this suit.

# I.  BACKGROUND

### A.  Procedural Background

Pope unsuccessfully filed a series of prior applications for Social Security disability benefits and Supplemental Security Income ("SSI") on June 13, 2005, August 15, 2006, and August 28, 2006, which were all denied by the administration. Pope filed the current application for SSI on January 21, 2011, contending severe, disabling paranoid schizophrenia beginning January 1, 1996. The Social Security Administration initially denied Pope's claim on May 27, 2011, and again on reconsideration on August 23, 2011. Pope then filed a written request for hearing by an Administrative Law Judge ("ALJ"), accompanying his request with an addendum that he was hearing voices worse than before and had severe anxiety in public places. The hearing occurred on January 12, 2012. Pope was accompanied by counsel, Lisa Douglas, and an impartial vocational expert ("VE"), Robin Scher. On March 5, 2012, the ALJ denied Pope's claim, and the appeals counsel denied his request for review of the ALJ's decision. Pope now seeks judicial review of the ALJ's decision under 42 U.S.C. § 405(g).

### B.  Pope's Age, Education, and Vocational History

Pope was born on September 30, 1967. Claimant reports that he received "special education" while in school, and has completed the 12th grade. From 1986 until 1998 Pope worked for a moving company. The job mainly involved loading furniture on and off of a moving truck. After this date, Pope did a few "odd jobs," generally non-specialized labor, never making more than $2000 per year. In 2010, Pope worked one week for Edible Arrangements, a catering company, but allegedly was unable to continue working for longer because of his disabling symptoms. At the time of his ALJ hearing, Pope volunteered as a janitor about three hours a day, five days a week for the Downtown Streets Team, a program created to provide homeless individuals with volunteer work experience as well as housing, food vouchers, and other necessities to help participants work toward permanent employment. It was Pope's case manager through Downtown Streets Team who noticed Pope was having a debilitatingly hard time comprehending instructions and concentrating, and who believed Pope incapable of continuing the program. The same case manager originally suggested that Pope apply for SSI.

Pope has been in and out of prison during his 20s and 30s, generally on drug-related charges, but also for six theft arrests, and at least one DUI. Pope was most recently arrested in 2007 for drug usage while on parole. Pope served a total of three months in prison.

### C.  Pope's Medical History

Pope alleges that he was first diagnosed with paranoid schizophrenia after the death of his grandmother in 1994, when he began experiencing auditory hallucinations. Secondary to his auditory hallucinations, Pope states that he became increasingly depressed and was hospitalized for depression in 1997. His medical records reflect reported symptoms of schizophrenia, including auditory hallucinations, as early as 2003 when he was prescribed the antipsychotic Risperidone by a psychiatrist in Solano Country Prison. Certified Administrative Record ("AR") 231.

Pope has a history of drug and alcohol use and abuse, apparently intermittently continuing until sometime in late 2007.[2] Pope, however, was treated for his psychotic symptoms during periods of sobriety. AR 231, 236, 238-39. According to Pope, his symptoms have not decreased since achieving sobriety, and his auditory hallucinations are severely distracting, often preventing him from interacting with others or sleeping in his own home. Since 2003, Pope has been in and out of prison and has received extensive treatment for his symptoms.

On December 14, 2005, while in custody for a petty theft charge, Pope was treated by a "mental health interdisciplinary treatment team" consisting of K. Kumar, M.D., S. Parroff, Ph.D., and a non-physician. AR 233. The treatment team's notes reflect that Pope was under the influence alcohol and reflect a diagnosis of depressive disorder and "substance-induced psychosis." *Id.* The doctor again prescribed Risperidone. *Id.*

In 2006 through 2007, at a parole outpatient clinic, Pope met several times with treating psychiatrist Hamid Sial, M.D. and treating psychologist Steven Dolezal, Ph.D. AR 234-49. The record also reflects that Pope was a "no show" to several appointments. AR 234-35, 238. In July 2006, Pope told Dr. Sial that he was "struggling with his paranoia and voices." AR 240. Dr. Sial

---

[2] In March 2008, Pope reported his last drug use to be "months ago," which could indicate some date in 2007. AR 160. In September 2008, Pope reported his last alcohol use to be a year ago. AR 229. These dates are consistent with drug usage ending somewhere in late 2007. However, Pope informed the ALJ that his last usage was "probably 2004," AR 68; he told his treating psychiatrist in 2011 that his last use was "5 years ago," AR 308, which would be sometime in 2006; and he told his case evaluator that he "abused alcohol and cocaine from 1994 until 1999," AR 257.

prescribed Risperidone and Zoloft. AR 239-40. In September 2006, Pope told Dr. Sial that he was benefiting from his mediation, the Zoloft was "useful in reducing his depression," he was "'working out' at the gym," he had "a girlfriend," and he was "clean and sober." AR 239. Following that appointment, sometime in the Fall of 2006, Pope came into the clinic "unscheduled because he had run out of medications." AR 238. At that appointment, Pope reported "relatively stable psychotic symptoms" when taking Risperidone 1mg, but experienced some sedative side effects with Risperidone. *Id.* Pope also reported "occasional auditory hallucinations." *Id.* Dr. Sial decided to continue Pope on the same medications, but decreased the dose of Risperidone and advised Pope to follow up with Dr. Dolezal for psychotherapy. *Id.*

Pope met with Dr. Dolezal twice in April 2007. At the first appointment, Pope stated that he had tested positive for drugs in November 2006 (cocaine and alcohol), and stopped his medication in December 2006. AR 236. Pope claimed to be paranoid and requested medication, but Dr. Dolezal observed "no indication of lack of concentration, distraction, or other obvious signs of responding to internal stimuli." *Id.* Dr. Dolezal referred Pope to psychiatry. *Id.* At the second visit a week later, Pope reported "good general physical health" but that his symptoms were increasing. AR 235. Pope denied any substance abuse and stated that he "indend[ed] to find a job and focus on self-sufficiency." *Id.* The remaining records from Dr. Sial's treatment in 2007 indicate that Pope failed to show up for his appointments. AR 234-35.

On September 3, 2008, Pope was admitted to San Quentin prison ("SQ"). AR 231. Interdisciplinary progress notes from a cell visit on October 7, 2008 indicate that Pope complained of hearing voices talking to him, which started up "3 weeks ago after [his] admission at SQ." *Id.* Pope reported that, before arriving at SQ, he had not heard the voices for four months. *Id.* The evaluating licensed clinical social worker stated: "It is unclear if inmate has a substance induced psychosis" because "if his statement is correct that the [auditory hallucinations] started 3 weeks [ago] after the admission at SQ it is debatable if the [auditory hallucinations] could have been caused by prior substance abuse since he denies AH immediately after arrival at SQ." *Id.*

Starting in January 2011, Pope began treatment with his primary treating physician Daryn Reicherter, M.D. AR 315, 281-87. In March 2011, Dr. Reicherter saw Pope for a second time and

prescribed Haldol to treat Pope's symptoms. AR 282. Again in April 2011, Dr. Reicherter met with Pope and continued prescribing Haldol. AR 281.

On April 14, 2011, Pope met with SSA consultative examiner Ute Kollath, Ph.D, who observed that Pope's "grooming was good," and presented himself without any bizarre behavior. AR 256. Dr. Kollath reported that Pope alleged auditory hallucinations and paranoid symptoms, but was not medically compliant with his prescribed medications. AR 256-57. Dr. Kollath administered a variety of cognitive tests to Pope. AR 250. Pope scored a 65 on the full-scale IQ test, *id.*, consistent with mental retardation, but seemingly inconsistent with Dr. Reicherter's observation that Pope was of average intelligence. Dr. Kollath diagnosed "polysubstance dependence, full remission per self-report [and] malingering" based on his belief that Pope tended to over-emphasize symptoms for personal gain on the TOMM and M-FAST tests. AR 259. Dr. Kollath, however, indicated that Pope's mood disorder may have affected the malingering testing, and agency medical consultant Dr. Murillo, reported that " [t]he TOMM is not always an accurate indicator of malingering especially if there are severe [mood disorders]."  AR 302.

After April 2011, Pope had a series of missed appointments with Dr. Reicherter, returning once against in August 2011. AR 306-09, 312. At this visit, Dr. Reicherter increased Pope's Haldol dosage. AR 312. Dr. Reicherter also completed a disability assessment form, where he diagnosed Pope with paranoid schizophrenia; reported that Pope's memory was "normal" and his intelligence was "average"; reported that Pope's suffered auditory hallucinations and had impaired judgment; reported no drug use in the 'past 5 years" (i.e., dating back to 2006); and reported that Pope could not complete a normal workday or workweek without interruptions from psychologically based symptoms. AR 306-09.

In a letter dated January 11, 2011, Dr. Reicherter wrote that "Pope does not malinger" but "[r]ather tends to under report symptoms." AR 313. In this letter, Dr. Reicherter also questioned the reliability of Dr. Kollath's cognitive testing stating, "[i]t is not clear that these tests could be reliable given the severity of [Pope's] symptoms that have been observed in the past." *Id.*

On January 25, 2012, Pope again visited Dr. Reicherter and reported discontinuing Haldol due to "overwhelming side effects." AR 319. Dr. Reicherter discussed the possibility of treatment

1    with new generation anti-psychotic medications. AR 317, 319. At the ALJ's request, Dr. Reicherter

2    completed a treating psychiatrist questionnaire further explaining the basis for his diagnosis of

3    paranoid schizophrenia (which meets the criteria for Listing 12.03). AR 314-18. In the

4    questionnaire, Dr. Reicherter explained that Pope experiences delusional thoughts and frequent

5    auditory hallucinations that are not drug induced. AR 315-17. He stated: "[Pope] has classic

6    symptoms of schizophrenia outside the context of substance use." AR 317.

7        Pope's case manager Gina Matthews, MHRS, also submitted a Third Party Function Report,

8    AR 206-12, which is generally consistent with Dr. Reicherter's reports, and explains that Pope is

9    homeless and has "a very difficult time being around other people, . . . hears voices constantly , and

10   becomes irritable around others." AR 208, 211.

11       **D. The ALJ's Decision**

12       The ALJ found no "good cause" to reopen Pope's prior negative SSA determinations,

13   concluding that they remained in force pursuant to *res judicata*. The ALJ further found Pope to be

14   "not disabled" at step two of a five-step analysis. At step two, the ALJ adopted the agency medical

15   examiner Dr. Kollath's diagnosis, concluding that Pope had two reasonably dependable medically

16   determinable impairments: a history of polysubstance abuse and malingering. The ALJ further

17   concluded that Pope did not have an impairment or a combination of impairments that significantly

18   limited his ability to perform work related activities for twelve consecutive months, and therefore,

19   Pope did not have a severe impairment or combination of impairments.

20       In arriving at this conclusion, the ALJ applied a two-step process adopted by the Ninth

21   Circuit and the agency regulations, *see Smolen v. Chater*, 80 F.3d 1273, 1281 n.1 (9th Cir. 1996), to

22   analyze Pope's symptoms. Where symptoms are subjective, such as Pope's auditory hallucinations,

23   a claimant must produce objective medical evidence of an underlying impairment or combination of

24   impairments which could reasonably be expected to produce pain or other symptoms alleged. *Id.* at

25   1282; *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); *Cotton v. Bowen*, 799 F.2d 1403,

26   1407-08 (9th Cir. 1986). If claimant meets step one, absent evidence of malingering, the ALJ may

27   reject claimant's testimony regarding the severity of the symptoms *only* by offering specific, clear

28   and convincing reasons. *Smolen*, 80 F.3d at 1283-84; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.

United States District Court
For the Northern District of California

1   1993). If the ALJ discredits the claimant's testimony regarding the severity of the symptoms, "[t]he

2   ALJ must state specifically which symptom testimony is not credible and what facts in the record

3   lead to that conclusion." *Smolen*, 80 F.3d at 1284. However, the ALJ may also discredit the

4   claimant's testimony if there is affirmative evidence of malingering. *Dodrill v. Shalala*, 12 F. 3d

5   915, 918 (9th Cir. 1993).

6        Applying this two part test to Pope's symptoms, the ALJ found: (1) that Pope's drug and

7   alcohol abuse and malingering could be reasonably expected to produce his alleged symptoms; but

8   (2) Pope's statements concerning the intensity, persistence and limiting effects of these symptoms

9   were "not credible to the extent that they are inconsistent with the finding that the claimant has no

10   'severe' impairment or combination of impairments."  AR 31. In reaching the first conclusion, the

11   ALJ gave substantial weight to the opinions of agency consulting sources, especially Dr. Kollath's

12   conclusion that Pope was not medically compliant with his prescribed psychotropic medications and

13   had "polysubstance dependence, full remission per self-report [and] malingering" based on his

14   tendency to over-emphasize symptoms for personal gain on TOMM and M-FAST tests. AR 259.

15   The ALJ gave little weight to Dr. Reicherter's assessment that Pope had paranoid schizophrenia

16   with extreme limitations in social functioning. The ALJ rejected this assessment on the grounds

17   that: (1) Dr. Reicherter had limited longitudinal contact with Pope; (2) Dr. Reicherter's opinions

18   were very brief and conclusory; (3) Dr. Reicherter's opinions were controverted by other

19   psychologists and the medical record as a whole; and (4) the timing and nature of Pope's contact

20   with Dr. Reicherter seemed overly self-serving, especially in light of the fact that Dr. Reicherter

21   ignored Pope's signs of malingering, medical non-compliance, and inconsistencies about his

22   substance abuse.

23        At step two, the ALJ rejected Pope's testimony regarding the severity of his symptoms

24   because: (1) Pope presented no documentation of his alleged past psychiatric hospitalization; (2)

25   Pope was arrested for six alleged theft arrests and tested positive for signs of malingering; (3)

26   Pope's past evaluations have diagnosed substance-induced psychosis, and Pope has been described

27   as "relatively stable" despite not taking his medication during periods of sobriety; (4) Pope has lied

28   several times on the record regarding his use of drugs and his compliance with his medication; and

1   (5) Pope is able to drive, use public transportation, and work five days a week as a janitor. Because

2   Pope has a medically determinable mental impairment (which the ALJ defined as poly-substance

3   abuse and malingering), the ALJ considered the four broad functional areas set out in the disability

4   regulations for evaluating mental disorders and found that Pope has "no limitation" in any of the

5   four areas. AR 31-32. Alternatively, the ALJ found that if the agency physician Dr. Kollath's

6   assessment that Pope could perform simple repetitive tasks was accepted, a finding of "not

7   disabled" would also be reached under the fifth step because of Pope's age, education and

8   vocational experience. AR 32.

9   ## II.  LEGAL STANDARD

10          The court has jurisdiction to review the Commissioner's decision denying benefits pursuant

11   to 42 U.S.C. § 405(g). However, the district court's scope of review is limited. The Commissioner's

12   decision (here the decision of the ALJ) will be disturbed only if it is not supported by substantial

13   evidence or if it is based upon the application of improper legal standards. 42 U.S.C. § 405(g);

14   *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In this context, evidence is substantial if it

15   is "more than a mere scintilla but less than a preponderance; it is such relevant evidence that a

16   reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Charter*, 108 F.3d

17   978, 980 (9th Cir. 1997). To determine whether substantial evidence exists to support the ALJ's

18   decision, the court examines the administrative record as a whole and considers evidence both

19   supporting and detracting from the Commissioner's conclusion. *Tackett v. Apfel*, 180 F.3d 1094,

20   1098 (9th Cir. 1999). Where evidence exists to support more than one rational interpretation, the

21   court must defer to the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005);

22   *Sandgathe*, 108 F.3d at 980.

23          Substantial evidence requires "such relevant evidence as a reasonable mind might accept as

24   adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). An ALJ may

25   set forth specific and legitimate reasons by "setting out a detailed and thorough summary of the

26   facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."

27   *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ need not accept the opinion of any

28   physician, including a treating physician, if that opinion is brief, conclusory, and inadequately

supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When an ALJ rejects either a physician's opinion on disability or diagnosis, he "must do more than offer his conclusions," and "must set forth his own interpretations and explain why they, rather than the doctor's, are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

## III.  ANALYSIS

The court holds that the ALJ erred at the second step of the five-step disability determination. Specifically, the court reaches its holding based on two of Pope's arguments. First, Pope argues that the ALJ wrongly determined that Pope did not suffer from paranoid schizophrenia, which Pope contends would meet "Listing 12.03 Schizophrenic, paranoid and other psychotic disorders" and qualify Pope for SSA disability benefits. Second, Pope contends that the ALJ did not properly consider the opinion of Gina Matthews, Pope's case manager with the Downtown Streets Team. The court considers each in turn.

### A.  Pope's Schizophrenia

The court finds that the ALJ's conclusion that Pope does not suffer from paranoid schizophrenia is not supported by substantial evidence. The evidence that Pope suffers from paranoid schizophrenia is largely uncontradicted by the record. Doctors Dolezal, Sial, Murillo, and Reicherter all independently concluded that the cause of Pope's auditory hallucinations was schizophrenia, not any substance abuse. Notably, several physicians relate that Pope's symptoms continued during periods of sobriety. When Pope was treated regularly by Dr. Sial and Dr. Dolezal while on parole in 2006, Pope indicated that he was clean and sober, yet Dr. Sial continued prescribing Risperidone to keep Pope's hallucinations under control. AR 234-251. The ALJ cites a handful of phrases from Dr. Sial and Dr. Dolezal's records to support his conclusion that Pope is not schizophrenic. For example, the ALJ quotes Dr. Sial's notes that Pope was "doing well, working out, with a girl-friend, being clean and sober . . . and with Zoloft helping to control his depression" and that Pope was "relatively stable even though he ran out of his psychotropic medication." AR 28. Yet, the ALJ fails to mention that Pope was treated throughout this period with anti-psychotic medication and that Pope reported auditory hallucinations despite taking the medication. AR 235-240. The ALJ also omitted the portion of Dr. Dolezal's notes which record that Pope once ceased

United States District Court
For the Northern District of California

1    taking his medication and found that his symptoms increased. AR 241. The ALJ may not "cherry-

2    pick" from records to support a denial of benefits. *Cotton v. Astrue*, 374 Fed. App'x 769, 773 (9th

3    Cir. 2010) ("ALJ's cherry-picking of [claimant's] histrionic personality out of her host of other

4    disorders is not a convincing basis for the adverse credibility finding.").

5         Moreover, during a period of sobriety at San Quentin prison in October 2008, the evaluating

6    licensed clinical social worker questioned whether it was possible that Pope's symptoms were drug-

7    induced given that Pope's hallucinations recurred and intensified three weeks after Pope was

8    admitted to the prison. The ALJ quotes the prison psychologist's statement, "it is unclear if inmate

9    has a substance-induced psychosis," as evidence that the psychologist questioned whether Pope is

10   schizophrenic. However, in the context of the psychologist's observation that Pope had been sober

11   for three weeks, the quotation indicates the psychologist's belief that Pope's symptoms are not

12   substance-induced, but rather that they derive from a separate mental illness.

13        Furthermore, Dr. Reicherter's records, which cover five visits from 2011 to 2012, offer

14   additional support that Pope suffers from schizophrenia. Dr. Reicherter diagnosed Pope with

15   schizophrenia, prescribed Pope medication, and adjusted Pope's dosage on several occasions. AR

16   192-97. Unlike earlier opinions, Dr. Reicherter's reports of Pope's symptoms are also not colored

17   by Pope's drug and alcohol use. While it is unclear exactly when in 2007 Pope stopped using crack

18   cocaine and alcohol, there is no evidence of record that Pope continued to use alcohol or crack

19   cocaine anytime in 2008 or beyond.[3] The ALJ attacks Dr. Reicherter's reliability on several

20   grounds, and the court does not intend to suggest that Dr. Reicherter's opinions are unassailable.

21   Rather, the court merely finds that Dr. Reicherter's opinions, which were recorded over the course

22   of five separate visits by Pope, only further corroborate the numerous other physicians who are in

23   nearly unanimous independent agreement that Pope suffers from schizophrenia.

24        To combat this significant evidence of continuing treatment for schizophrenia by several

25   different doctors, the ALJ points to two lone evaluations in support of his conclusion that Pope does

26   not suffer from paranoid schizophrenia. The first opinion comes from an interdisciplinary treatment

27   _____

28   [3] The ALJ's finding that Pope continued using cocaine "until *at least* 2008," AR 27, is unsupported
     by the record. The ALJ cites a March 2008 medical record in which Pope reported his last use of
     cocaine to be "months ago," which would indicate sometime in 2007. AR 160.

United States District Court
For the Northern District of California

1    team while Pope was incarcerated on December 14, 2005. However, the treatment team did not

2    dismiss Pope's symptoms as nonexistent as the ALJ did, but instead determined that they were

3    substance-induced. This conclusion, that Pope's symptoms were substance-induced, was natural

4    given that Pope admitted to abusing drugs, was reportedly under the influence of alcohol at the time,

5    and was imprisoned on alcohol-related charges. AR 233. The December 14, 2005 medical report

6    thus offers only minimal support for the ALJ's analysis.

7         The ALJ also relies on Dr. Kollath's single evaluation of Pope on April 14, 2011. Dr.

8    Kollath performed a "complete psychological evaluation" of Kollath for the Department of Social

9    Services to aid in determining Pope's disability status. Dr. Kollath also administered TOMM and

10   M-FAST tests to measure Pope's tendency to exaggerate his symptoms for personal gain. Dr.

11   Kollath found that Pope's TOMM and M-FAST results did "indicate tendency of over-endorse [sic]

12   symptoms for personal gain." AR 259. Dr. Kollath also observed that Pope exhibited mild

13   impairment in his ability to perform some work activities, but, due to the TOMM and M-FAST

14   results, Dr. Kollath could diagnose no more than "Polysubstance Dependence In Full Remission per

15   self report," "Malingering," "Personality Disorder NOS With Antisocial Personality Traits," and

16   "Problems related to: Mental health issues." *Id*. Dr. Kollath summarized his findings not as a

17   rejection of a schizophrenia diagnosis, but as an inability to make any real conclusions: "The

18   claimant's performance on mental status was mixed. . . . Claimant could well have symptoms of a

19   major mood disorder, anxiety disorder, cognitive disorder, somatoform disorder, psychotic disorder,

20   or [sic] however his variable motivation towards the assessment interfered with a full evaluation."

21   *Id*.

22        As such, the medical evidence cited by the ALJ either does not support the ALJ's finding, is

23   biased by Pope's substance abuse at the time of the evaluation, or is quoted out of context. Even

24   ignoring those problems with the ALJ's cited medical evidence, the ALJ's conclusion that Pope

25   does not suffer from schizophrenia is not supported by substantial evidence because the two

26   evaluations that do tend to support the ALJ's finding—the prison evaluation on December 14, 2005

27   and Dr. Kollath's evaluation on April 14, 2011—are contradicted by overwhelming evidence from

28   doctors Pope regularly visited, referred to as "treating physicians." *See* 20 C.F.R. § 416.902

(defining a "treating source"). A treating physician's opinion should be given more weight than the opinion of other doctors who do not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Accordingly, the ALJ erred in finding that Pope does not suffer from schizophrenia.

### B. Consideration of Downtown Streets Team Testimony

The ALJ also erred in his failure to consider testimony from Downtown Streets Team employees Gina Matthews and Chris Richardson. Ms. Matthews was Pope's case manager at the Downtown Streets Team for eight months when she submitted a third party function report to the Social Security Administration. In the report, Ms. Matthews states that Pope was "homeless due to symptoms of mental illness," that it was "extremely difficult for [Pope] to be around others," and that "his concentration and understanding are affected" by his symptoms. AR 208, 210, 211. Ms. Matthews also relates that Pope "hears voices constantly, and becomes irritable around others." AR 211. Ms. Matthews reports that Pope "often acts out by yelling at the voices in public places, which causes him embarrassment." *Id*.

Mr. Richardson, the Director of Program Operations for the Downtown Streets Team, provides some context for Ms. Matthews' comments. Mr. Richardson explains:

> [T]he Streets Team Program was created to provide homeless individuals with a volunteer work experience program. It is important to distinguish our program from vocational training, however, as the Downtown Streets Team is designed to give homeless volunteers experience with very basic employment elements such as arriving on time, receiving direction from supervisors, and working with others. This is not work. The program is highly structured and supportive for the individuals who enroll; they can take breaks when they want, they do not need to complete their tasks, and they are given many chances with absences and mistakes.
>
> Unlike many of the program participants, Mr. Pope had to be handheld through the housing process and was unable to complete tasks other participants can complete on their own. He also came and went from the program a number of times. When a participant does not show up for the program, he or she gets a "strike" rather than being fired. When a participant gets three strikes, he or she is out of the program and must re-apply. Mr. Pope was not able to maintain regular attendance and got "strikes" on a regular basis. He also had difficulty completing tasks when he was in attendance. He is a very nice, likeable guy, but he seems to have serious difficulties with comprehension and concentration.

AR 224.

Mr. Richardson also notes that the Downtown Streets Team's interest is in helping its participants gain permanent employment. The Downtown Streets Team considers applying for social security benefits to be a last resort, and they assist a participant in applying for benefits only when they do not think the participant is able to hold a permanent job:

> Part of our program is to help our participants get jobs. We help them with resumes, interview skills, and since 2005, we have helped more than two hundred individuals find permanent employment. We do not generally help our participants apply for SSI or SSDI when we think they can get a job. However, we quickly saw that Mr. Pope had serious difficulties related to his mental illness, and he also exhibited signs of a learning disability or other intellectual limitation. He has a hard time understanding things that other participants can grasp with ease. For these reasons, we helped him connect with a case manager so that [sic] could help him apply for SSI.

AR 224. Mr. Richardson summarizes:

> Many of the individuals that graduate from our program are ready for employment and can find permanent positions, but most who don't graduate simply are not ready. Our program is voluntary and is merely an introduction to some of the skills an individual might need in the workplace. We provide such a degree of handholding that if they are unable to make it through the Streets Team program, we are fairly confident they cannot maintain permanent employment.

AR 225. Therefore, according to Mr. Richardson and Ms. Matthews, who have dealt with Pope for eight months, Pope is so severely limited by his schizophrenia that he is unable to perform even simple jobs.

The claimant may submit evidence from "other sources" such as "social welfare agency personnel." 20 C.F.R. § 404.1513(d)(3). The ALJ is required to consider lay testimony, and may not disregard it without giving reasons germane to each witness. *Schneider v. Comm'r of Soc. Sec.*, 223 F.3d 968, 975 (9th Cir. 2000); *Smolen*, 80 F.3d at 1288. The ALJ in the instant case, however, hardly mentions the Downtown Streets Team program at all. When the ALJ does refer to the Downtown Streets Team program, he contends that it supports his finding that Pope is not disabled. The ALJ states that "the record indicates that the claimant was working '5 days a week, 2-3 hours a day' as a janitor, in exchange for food vouchers. The record does not specify the amount of food vouchers earned, but this total might well approach SGA [substantial gainful activity]." AR 26. The

ALJ mentions Ms. Matthews' testimony three more times throughout the opinion, but only in terms of Pope's "work schedule, 5 days a week, 2-3 hours a day, as a janitor." AR 30. The ALJ's interpretation of the Downtown Streets Team submissions as demonstrating that Pope can perform normal work ignores the entirety of Ms. Matthews' testimony and Mr. Richardson's letter. As reviewed above, Mr. Richardson is clear that "[t]his is not work," that participants "can take breaks when they want," and that participants "do not need to complete their tasks." AR 224. The ALJ also omits any mention of Ms. Matthews' or Mr. Richardson's observations that "Pope had serious difficulties related to his mental illness," that Pope "had difficulty completing tasks when he was in attendance," and that Pope "seems to have serious difficulties with comprehension and concentration." *Id*. Ms. Matthews and Mr. Richardson are unequivocal in their testimony that Pope is unable to maintain permanent employment due to his mental illness, yet the ALJ neglects this conclusion as well. Therefore, the ALJ erred in his misinterpretation of the Downtown Streets Team evidence.

**C.  Remand**

The court remands the case to the ALJ for reconsideration consistent with the court's holdings that: (1) the ALJ erred in finding that Pope does not suffer from schizophrenia; and (2) the ALJ improperly analyzed the Downtown Streets Team evidence. On remand, the ALJ must determine the extent to which Pope follows his physician's treatment plan. 20 C.F.R. § 416.930; *see also, e.g.*, *Matlock v. Barnhart*, 90 F. App'x 208, 210 (9th Cir. 2004). In this inquiry, without suggesting a particular outcome, the court notes that the ALJ should consider that failing to comply with treatment can itself be a symptom of mental illness.

Further, on remand, the ALJ must determine whether Pope's disability qualifies as a presumptive disability under agency guidelines (step three). If not, the ALJ must analyze Pope's residual functioning capacity (step four) and consult a vocational expert (steps four and five).

**IV.  ORDER**

For the foregoing reasons, the Commissioner's cross-motion for summary judgment is DENIED. Pope's motion for remand is GRANTED.

1

2     Dated: June 30, 2014

                                               _Ronald M. Whyte_
3                                              RONALD M. WHYTE
                                               United States District Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28